874 F.2d 968
 58 USLW 2042
 UNITED STATES of America, Plaintiff-Appellee,
v.
Douglas WILLIAMS, a/k/a "Doug," Buford Salter, a/k/a "Red,"
Ronald K. May, a/k/a "Ronny," Buddy LeDoux,
Kenneth Tyler, Larry Wiggins, and Dugan
Phillips, Defendants-Appellants.
 No. 87-2929.
 United States Court of Appeals,
Fifth Circuit.
 May 24, 1989.
Rehearing and Rehearing En Banc Denied June 22, 1989.
 
 Ronald S. Liebman, Jean V. MacHarg, Mitchell R. Berger, Deborah M. Lodge, Washington, D.C., for defendants-appellants.
 Mervyn Hamburg, Atty., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Texas.
 Before RUBIN, KING, and GARWOOD, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 Defendants-appellants Douglas Williams (Williams), Buford "Red" Salter (Salter), Ronald May (May), Buddy LeDoux (LeDoux), Kenneth Tyler (Tyler), Larry Wiggins (Wiggins), and Dugan Phillips (Phillips) appeal from their convictions for obstruction of justice under 18 U.S.C. Sec. 1503. The jury found Williams guilty of corruptly, and with the intent of impeding the due administration of justice, endeavoring to influence a subpoenaed grand jury witness to give false testimony. The remaining appellants were convicted under section 1503 for endeavoring to obstruct the due administration of justice by giving specified false testimony before a grand jury in a manner that blocked the flow of truthful information and impeded justice. All of the appellants received probated confinement sentences and were assessed fines ranging from $2,500 to $10,000.[1]
 
 
 2
 Counsel for Douglas Williams has filed a Suggestion of Death advising that Williams died on or about May 6, 1989, after submission of this appeal on oral argument but while decision was still pending. We accordingly hereby sever Williams' case from that of all the other appellants and remand Williams' case to the district court with instructions to vacate his judgment of conviction and sentence and to dismiss the indictment as to him because of his death. See United States v. Welborn, 849 F.2d 980, 985 (5th Cir.1988); United States v. Pauline, 625 F.2d 684, 685 (5th Cir.1980).
 
 
 3
 The remaining appellants (hereafter collectively "appellants") claim that their convictions should be overturned because (1) there was prosecutorial abuse of the grand jury process; and in any event, (2) there was insufficient evidence to support their convictions since it was not shown that their grand jury testimony had the effect of impeding justice or entirely closing off avenues of the grand jury's inquiry. We find that the prosecutor did not abuse the grand jury process in a manner that justifies overturning these appellants' convictions, and that there was sufficient evidence to support their convictions. We accordingly affirm as to them.
 
 Facts and Proceedings Below
 
 4
 Appellants' convictions are the remaining vestiges of a forty-seven-count indictment against members of the Fredeman family, their companies, and employees for alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1961 et seq., and related offenses, primarily in relation to the Fredeman companies' "midstream" fueling operations.[2] The Fredemans, of Port Arthur, Texas, own and operate several companies that engage in the towing and fueling of vessels in the coastal waters of East Texas, Louisiana, and to some extent, Mississippi and Alabama.[3]
 
 
 5
 The Fredeman business began in the 1940s when William "Cap" Fredeman, Sr. converted a shrimp boat to a towboat and began Port Arthur Towing Company (PATCO). The company prospered in the post-World War II boom, and in 1957 Cap Fredeman opened one of the first "midstream" fueling operations, Channel Marine Fueling Service. In 1968, the Fredemans established another midstream fueling company, Palmer Midstream.[4] The Fredemans rapidly became the dominant presence in the area's marine fueling industry.[5]
 
 
 6
 Refueling a customer vessel generally involved attaching a hose from a Fredeman supply vessel to the fuel hatch of the customer vessel. A meter on the Fredeman vessel recorded the fuel dispensed; however, many of the customers' vessels did not have devices to accurately record the fuel they received. Allegedly in about ninety percent of their fueling transactions the Fredemans underdelivered fuel to their customers' vessels.
 
 
 7
 Basically two methods of cheating were employed. The "hit" valve method involved diverting fuel back to the Fredeman supply vessel through a concealed hose that ran under the supply vessel's deck and back into its supply tank. The other method involved running up the meter before attaching the hose to the customer's fuel hatch. Several former Fredeman employees testified, before the grand jury and at trial, that the company goal was to steal ten to fifteen percent of the customer's "purchased" fuel.[6]
 
 
 8
 The appellants were all long-time employees of the Fredeman companies.[7] Each of them, at various times throughout their employment, was in a position to observe and participate in the fuel thefts. Some of the appellants were in a position to direct other employees to steal fuel and to instruct employees in the methods of stealing fuel. Salter was a dock manager in Louisiana, Mississippi, and Alabama. LeDoux had worked as a deckhand, mate, boat captain, and also as a dock manager in Louisiana before he assumed an office position. May was a boat captain and later a dock manager. Tyler was a deckhand, boat captain, and later a dock manager. Wiggins was a deckhand, tankerman, and boat captain. Phillips was a deckhand, boat captain, and later a dock manager.[8]
 
 
 9
 While the Fredemans' profits grew, many of their competitors' profits withered.[9] In 1983, one of the Fredemans' primary competitors filed a federal antitrust suit against the Fredemans charging the Fredemans with monopolization of fuel sales by theft, bribes, and fraud.[10] In this civil suit, all of the appellants were deposed in 1983 and each denied any knowledge of such activity within the Fredeman organization. Early in 1984, the district court that was presiding over the civil suit referred the allegations of wrongdoing to a federal grand jury for investigation.[11]
 
 
 10
 The grand jury investigation continued through 1985 and into 1986. On October 2, 1985, Stephen Landry, a former Channel Fueling employee, testified that fuel thefts had occurred. This was in direct contradiction to his earlier deposition testimony in the civil suit where he had denied knowledge of any thefts.
 
 
 11
 LeDoux, Salter, May, Wiggins, Tyler, and Phillips testified before the grand jury in January and February 1986.[12] They each denied any knowledge of the intentional fuel underdeliveries or thefts--a position that was consistent with their civil suit depositions testimony. Prior to giving their grand jury testimony, the prosecutor at the grand jury proceedings told each appellant that he was not currently a target of the investigation. The prosecutor advised each appellant that he was subpoenaed as a witness to provide any information that he possessed with regard to the general investigation into the fuel underdeliveries.[13] The appellants were also cautioned that they could be charged with perjury for each false statement they made under oath. In addition, the prosecutor told the appellants that they had the right to consult their attorney at any time during the questioning,[14] and the majority of the appellants were advised in the presence of the grand jury of their Fifth Amendment rights.[15]
 
 
 12
 On April 17, 1986, the federal grand jury returned a forty-seven-count indictment charging the Fredemans, the Fredeman Companies, and several Fredeman employees with violations of RICO and related statutes. The appellants were charged with RICO conspiracy and substantive RICO violations. In addition, the appellants were charged with obstruction of justice in violation of 18 U.S.C. Sec. 1503 by "knowingly, intentionally and corruptly endeavor[ing] to obstruct the due administration of justice by testifying falsely under oath to the Grand Jury, in a manner that blocked the flow of truthful information" and "impeded justice."
 
 
 13
 After four months of trial, eighteen counts were submitted to the jury for deliberation. The jury found each of the appellants guilty of one count of obstructing justice under 18 U.S.C. Sec. 1503. The jury acquitted all appellants on two counts[16] and was unable to reach a verdict on the remaining counts. The appellants were later sentenced, and they timely bring this appeal.
 
 Discussion
 
 14
 Appellants claim that there was prosecutorial abuse of the grand jury process that requires reversal of their convictions under the due process clause of the Fifth Amendment or in the exercise of our supervisory power. They also assert there was insufficient evidence to support their convictions because, they contend, it is not shown that their grand jury testimony had the effect of impeding justice or entirely closing off avenues of the grand jury's inquiry.
 
 I. Abuse of the Grand Jury Process
 
 15
 Appellants assert that the charges against them for obstruction of justice under 18 U.S.C. Sec. 1503 were "manufactured" by the prosecution. They claim that the prosecutor, believing that he could prove that they had lied in their civil depositions, induced them to commit perjury before the grand jury by telling them they were not targets of the grand jury investigation. Allegedly, the prosecutor induced the perjury in order to create obstruction of justice counts that would bolster the government's RICO case.[17]
 
 
 16
 Appellants state that the record demonstrates that the sole reason that appellants were subpoenaed before the grand jury was to trap them into committing perjury.[18] The district court did note that the prosecutor engaged in some questionable practices. In particular, it questioned the prosecutor's practice of advising appellants that they were not targets of the investigation when the prosecutor believed he could prove they had lied in their earlier depositions.[19] However, the use of improper prosecutorial tactics does not automatically lead to the conclusion that the prosecutor's primary or sole intent in bringing appellants before the grand jury was to manufacture charges rather than to investigate crime.
 
 
 17
 It is undisputed that all of the appellants were employees of the Fredeman companies and that they all had firsthand knowledge of the Fredemans' midstream fueling operations. Several of the appellants had worked for the Fredemans for over twenty years and, thus, unlike many of the former short-term employees who testified for the government, they possessed an immense storehouse of information.[20] Appellants' testimony was clearly relevant, and potentially significant to the grand jury investigation. In addition, the grand jury has the right to observe a witness' spontaneous responses, rather than contenting itself with the witness' prior civil deposition involving similar questions. See, e.g., United States v. Vesich, 724 F.2d 451, 461 (5th Cir.1984), reh'g denied, 726 F.2d 168 (1984).
 
 
 18
 The prosecutor's knowledge that the appellants had lied in their civil depositions does not lead to a presumption that the appellants would falsely testify before the grand jury. Id. It is more than a wholly abstract or theoretical possibility, even without a grant of immunity, that a witness who has previously lied in a civil suit will decide to tell the truth before a federal grand jury. Indeed, in the present case, at least one trial witness who had lied previously decided to testify truthfully because federal investigators became involved in the matter.[21]
 
 
 19
 The prosecutor clearly and emphatically informed each of the appellants of the possibility of a perjury charge for telling falsehoods under oath. In some instances, the prosecutor interrupted his line of questioning to remind an appellant of the possibility of a perjury charge for false statements under oath.[22] These emphatic and sometimes repeated warnings regarding the possibility of perjury charges are inconsistent with a singular motive to induce perjury in order to create obstruction of justice charges.
 
 
 20
 Despite the appellants' long-term, intimate knowledge of the Fredemans' fueling operations, and the prosecutor's clear warnings regarding perjury, appellants claim that the prosecutor's sole motive in subpoenaing them was to "induce" them to commit perjury through misrepresentation of their target status. We reject this contention.
 
 
 21
 The present case substantially differs from Brown v. United States, 245 F.2d 549 (8th Cir.1957), relied on by appellants, where the Court reversed a conviction for perjury before a Nebraska grand jury. The ultimate ground of decision there seems to have been that the evidence was not sufficient to show that any falsity in the testimony was "willful and corrupt" or anything more than the product of " 'lifting a statement ... out of ... context' " and then distorting its meaning. The opinion concludes by reversing "for insufficiency of the evidence." Id. at 556. However, it is likewise evident that this result was influenced by the Court's concern that the only purpose of calling the defendant before the Nebraska grand jury was to indict him for perjury before that body, as the underlying conduct concerning which he was questioned all occurred in Missouri, and whatever the defendant might have said could have "had no tendency to support any possible action of the [Nebraska] grand jury within its competency." Id. at 555. This is simply not the present situation. Here, there were objectively valid reasons for the prosecutor to call appellants before the grand jury--given their employment history, their truthful testimony could well have advanced the grand jury's actual and wholly legitimate investigation into the fuel theft conspiracy, particularly as to those in higher positions within the Fredeman companies. As has been frequently observed, " '[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined' " and "[l]eads to further inquiry may be of material worth to [such] an investigation.' " See Vesich, 724 F.2d at 460, 461 and authorities therein. Just because appellants had denied knowledge in their 1983 depositions in the private civil suit, and the prosecutor thought he could prove those denials were false, does not require the prosecutor to assume that appellants would testify untruthfully before the grand jury in 1986. Id. Certainly the prosecutor could not know that they would so testify; and if they did not, their testimony would likely have been relevant and helpful to the investigation. Even if the prosecutor in 1986 thought it more likely than not that they would repeat their previous 1983 denials--which has not been clearly established here--in this setting that would not suffice. Other federal appellate courts have not extended Brown to such a situation. See United States v. Chevoor, 526 F.2d 178, 185 (1st Cir.1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); United States v. Nickels, 502 F.2d 1173, 1176 (7th Cir.1974), cert. denied, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); United States v. DiGiovanni, 397 F.2d 409, 412 (7th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 256, 21 L.Ed.2d 260 (1968).
 
 
 22
 Nor does a different result obtain because appellants were allegedly falsely advised that they were not "targets" of the grand jury investigation. It is settled that a "target" defendant is not constitutionally entitled to advice of his target status, or even of his Fifth Amendment rights, when called to testify before the grand jury. See United States v. Wong, 431 U.S. 174, 97 S.Ct. 1823, 1825-26, 52 L.Ed.2d 231 (1977); United States v. Washington, 431 U.S. 181, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977); United States v. Valentine, 820 F.2d 565, 572 (2d Cir.1987); United States v. Babb, 807 F.2d 272, 276-78 (1st Cir.1986); United States v. Weiss, 752 F.2d 777, 785-86 (2d Cir.1985); United States v. Scrimgeour, 636 F.2d 1019, 1026 (5th Cir.1981); United States v. Crocker, 568 F.2d 1049, 1053-56 (3d Cir.1977). The above principles have been applied even as to affirmative mis advice concerning nontarget status. Babb; Weiss; Crocker. In Scrimgeour, we relied on Crocker and approvingly described its holding as follows: "In Crocker, the Government misled the defendant by telling him that he was not a target of the investigation, yet the perjury indictment was held to be valid despite a due process challenge." Scrimgeour, 636 F.2d at 1026 (emphasis in original).
 
 
 23
 Here appellants were apparently all warned of their Fifth Amendment rights, were told that although they were not presently "targets" they might yet be indicted, and were specifically warned that they could be charged with perjury for each false statement made to the grand jury. They were very familiar with the nature of the grand jury's investigation. They had counsel available at the time of their testimony, and the prosecutor told them that they could interrupt the questioning to consult their attorneys, should they desire to do so. Under these circumstances, we are not only unable to find a constitutional infirmity in appellants' convictions but we deem it inappropriate to set them aside on the basis of our supervisory power. We note in this connection that the principal vice of misinforming the witness that he is not a target is that he may be misled into waiving his Fifth Amendment rights--he may incriminate himself, or provide leads to the discovery of evidence against him, because he thinks he will not in any event be charged. See Babb at 277-79. However, " '[t]he privilege against self-incrimination bars compelled testimony as to past crimes; it does not shelter new perjury' " and " '[o]ur legal system provides methods for challenging the Government's right to ask questions--lying is not one of them.' " Id. at 277. We have before us only appellants' convictions for their false testimony before the grand jury. Advice or misadvice as to nontarget status is certainly no more calculated to produce false testimony under oath--especially when perjury is warned against--than it is to produce honest answers. While we strongly disapprove of any prosecutorial misleading of a grand jury witness, it likewise would ill serve the administration of justice to suggest that a judicially cognizable nexus may exist between a grand jury witness' belief that he personally is not a target of the investigation and his decision to thereafter give false testimony under oath to the grand jury. This is especially so here, given the express warnings of perjury, the witnesses' knowledge of what was being investigated, and the availability to them of their counsel.[23]
 
 
 24
 We reject the contentions of appellants that their convictions under section 1503 for giving false testimony to the grand jury should be reversed because of alleged prosecutorial abuse of the grand jury process.
 
 
 25
 We turn now to appellants' claims of insufficiency of the evidence.
 
 II. Obstruction of Justice
 
 26
 Appellants were all convicted on one count each of obstruction of justice in violation of 18 U.S.C. Sec. 1503. Section 1503 provides in pertinent part:
 
 
 27
 "Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, ... in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, ... in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both." 18 U.S.C. Sec. 1503 (emphasis added).
 
 
 28
 Section 1503 was enacted to protect individuals involved in federal judicial proceedings and to prevent "miscarriage[s] of justice by corrupt methods." Vesich, 724 F.2d at 453 (quoting Samples v. United States, 121 F.2d 263, 265 (5th Cir.), cert. denied, 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530 (1941)). The omnibus clause, emphasized above, clearly forbids all corrupt endeavors to obstruct or impede the due administration of justice.[24] See, e.g., United States v. Rasheed, 63 F.2d 843, 852 (9th Cir.1981), cert. denied, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); United States v. Griffin, 589 F.2d 200, 206 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979). There are three core elements that the government must establish to prove a violation of the omnibus clause of section 1503: (1) there must be a pending judicial proceeding; (2) the defendant must have knowledge or notice of the pending proceeding; and (3) the defendant must have acted corruptly with the specific intent to obstruct or impede the proceeding in its due administration of justice. See, e.g., Rasheed, 663 F.2d at 851-52; United States v. Partin, 552 F.2d 621, 641-42 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); see also Vesich, 724 F.2d at 454, 457.[25]
 
 
 29
 Appellants were charged with "knowingly, intentionally and corruptly endeavor[ing] to obstruct the due administration of justice by testifying falsely under oath to the grand jury, in a manner that blocked the flow of truthful information" and "impeded justice," in violation of 18 U.S.C. Sec. 1503.[26] They do not dispute that they had knowledge of the subject matter being investigated by the grand jury nor that each of them testified falsely before the grand jury with the specific intent to impede the due administration of justice. Rather, they urge that the government failed to plead and prove, as they assert is required by United States v. Griffin, 589 F.2d 200 (5th Cir.1979), that their false testimony had the actual effect of obstructing justice in that it closed off avenues of inquiry entirely. The argument in this connection essentially rests on two propositions; first, that section 1503 only proscribes conduct which constitutes contempt of court; and, second, that perjury itself does not constitute contempt unless there is added to it the further element of obstruction to the court in the performance of its duty.
 
 
 30
 The contention as to the scope of section 1503 is essentially historical. Section 1503 derives from section 2 of the Act of March 2, 1831, 4 Stat. 487.[27] The first section of the Act of March 2, 1831 has now become 18 U.S.C. Sec. 401.[28] As recounted in Nelles & King, Contempt by Publication in the United States, 28 Colum.L.Rev. 401; 28 Colum.L.Rev. 525 (1928), the Act of March 2, 1831 had its genesis in the impeachment trial of United States District Judge James Peck, who had held a lawyer in contempt for writing a newspaper article critical of a decision recently rendered by Judge Peck (the lawyer was counsel in several similar cases still pending before the judge). In January 1831, Judge Peck was acquitted in the Senate by the margin of but a single vote. Id. at 426-30. Shortly thereafter, the House instructed its Judiciary Committee " 'to inquire into the expediency of defining, by statute, all offences which may be punishable as contempts of the courts of the United States' "; such a bill was promptly introduced, was passed by the House on February 28, 1831, and ultimately became the Act of March 2, 1831. Id. at 430. It is important to note, however, that as originally passed by the House, the bill contained only the first section (what is now section 401), and the second section (what is now section 1503) was added by the Senate (and subsequently amended by the House). Id. at 530-31. Though there appears to be no express legislative history explaining the purpose or intended scope of the second section, Nelles and King infer that it was intended to fill the void presumably left by the limitations on the contempt power which the first section imposed. Id. at 531.
 
 
 31
 Appellants further rely on the decisions in Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919), and In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945), holding that perjury alone, in trial (Hudgings ) or before the grand jury (Michael ), could not be punished summarily by the court as contempt, unless there were "added to the essential elements of perjury ... the further element of obstruction to the court in the performance of its duty." Hudgings, 39 S.Ct. at 340; Michael, 66 S.Ct. at 80. The latter element "must clearly be shown." Hudgings at 339; Michael at 80.
 
 
 32
 Putting these principles together, the Sixth Circuit in United States v. Essex, 407 F.2d 214 (6th Cir.1969), held that making and filing with the court a false affidavit in an unsuccessful effort to obtain a new trial cannot be prosecuted under section 1503. This same history and authority was unsuccessfully pressed on us in Griffin, where we responded by stating, inter alia, "we doubt that the limitation on a federal judge's power to punish perjury summarily is also a limitation on the power to punish under Sec. 1503," id. 589 F.2d at 205, and "we see no reason ... to depart from the natural construction of the statute by reading the restrictive law of summary contempt into Sec. 1503." Id. at 206. We remain of that view.
 
 
 33
 In the first place, while it is doubtless a reasonable inference that the general motivation for the second section of the Act of March 2, 1831 was to fill the void which would be brought about by the first section, it does not necessarily follow that the second section did no more than that. Certainly there is nothing in the wording of the enactment which limits the second section to matters which would have constituted contempt absent the first section; nor are we aware of any legislative history reflecting such an intent.[29] Indeed, it has been held that the second section is not limited to filling the void left by the first section, as the second section may be violated by conduct punishable as contempt under the first. See Ex parte Savin, 131 U.S. 267, 9 S.Ct. 699, 701, 33 L.Ed. 150 (1889); United States v. Harris, 558 F.2d 366, 368 (7th Cir.1977). Moreover, the overriding purpose of the Act of March 2, 1831 was plainly to ensure that "the category of criminal cases which could be tried without a jury was narrowly confined." Nye v. United States, 313 U.S. 33, 61 S.Ct. 810, 815, 85 L.Ed. 1172 (1941). Nothing in that purpose supports an artificially limiting construction of the second section. In the second place, it may be doubted that the Hudgings-Michael limitations on perjury as contempt were clearly established or understood in 1831. Hudgings, decided eighty-some years later, observes that "there are decided cases which treat perjury, without any other element, as adequate to sustain a punishment for contempt." Id., 39 S.Ct. at 340. See also Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933)[30]; Griffin, 589 F.2d at 205-06.[31] Indeed, the holdings in Hudgings and Michael appear to be based in large part on the desirability of limiting the range of conduct prosecutable without the customary safeguards of indictment and trial by jury. Thus Michael states that broad contempt powers "would permit too great inroads on the procedural safeguards of the Bill of Rights, since contempts are summary in their nature, and leave determination of guilt to a judge rather than a jury" and, significantly, at once goes on to say: "It is in this Constitutional setting that we must resolve the issues here raised." Id., 66 S.Ct. at 79-80.[32] No such concerns are or ever were implicated in construction of either the second section of the Act of March 2, 1831 or section 1503. Accordingly, it seems highly dubious to retroactively, so to speak, apply the holdings of Hudgings and Michael in order to ascertain the intended coverage of section 2 of the 1831 statute.
 
 
 34
 It is also argued that there was no need to have false testimony covered by section 2 of the Act of March 2, 1831 because such conduct was also covered by the general perjury statute. Act of April 30, 1790, sec. 18, 1 Stat. 116.[33] The offenses do or did not completely overlap, however. Perjury requires that the testimony be given under oath (or affirmation), while there is no such requirement in section 1503 or its predecessor. On the other hand, section 1503 requires a specific intent to impede the administration of justice, United States v. McComb, 744 F.2d 555, 561 (7th Cir.1984); United States v. Johnson, 585 F.2d 119, 128 (5th Cir.1978); United States v. Moon, 718 F.2d 1210, 1236 (2d Cir.1983), while the mental state required for perjury is that the statement be made intentionally and with knowledge of its falsity. See United States v. Norris, 300 U.S. 564, 57 S.Ct. 535, 538-39, 81 L.Ed. 808 (1937); Bronston v. United States, 409 U.S. 352, 93 S.Ct. 595, 600, 34 L.Ed.2d 568 (1973) ("the state of mind of the witness is relevant only to the extent that it bears on whether 'he does not believe [his answer] to be true' "). While these states of mind are quite similar, they are not identical. Further, the penalty for perjury included three years' confinement when the 1831 statute was enacted, while under section 2 thereof the maximum confinement was three months,[34] and perjury, the much more serious offense, was more difficult to establish, generally requiring proof of falsity by two witnesses.[35]
 
 
 35
 However, we did not determine in Griffin whether all knowingly false grand jury testimony ipso facto constitutes a violation of section 1503, although we intimated that it might, saying "had Griffin's testimony been merely false, it might well have come under the terms of the omnibus clause of Sec. 1503, nonetheless." Id., 589 F.2d at 204. We did not reach that issue because we held that Griffin's testimony was not only false but also "had the effect of impeding justice", id., and that "his denials of knowledge had the effect of closing off venues of inquiry entirely." Id. at 205. Appellants seize on this language in Griffin and interpret it as in effect requiring independent proof that the grand jury's investigation was actually impeded in some way beyond merely being denied the evidence that could have been obtained from appellants had they not falsely denied all knowledge of the matters they were asked about, which were admittedly highly material to the investigation. We reject this construction of Griffin as being out of harmony with the overall thrust of our opinion there. As recited in that opinion, Griffin's grand jury testimony on which his section 1503 conviction rested consisted in significant part of the same sort of short, flat, and wholesale false denials of knowledge as those of our appellants here.[36] It is true that some other aspects of Griffin's testimony might more accurately be described as evasive or a mere denial of memory, rather than a flat, unequivocal denial of any knowledge.[37] However, we refused to attach significance to that purported distinction:
 
 
 36
 "We find it impossible to differentiate a flat refusal to testify from an evasive answer or a falsehood such as Griffin's.... By falsely denying knowledge of events and individuals when questioned about them, Griffin hindered the grand jury's attempts to gather evidence of loansharking activities as effectively as if he refused to answer the questions at all." Id. at 204.[38]
 
 
 37
 The same is true of appellants: their false denials of knowledge of events when questioned about them hindered the grand jury's attempts to gather evidence of the fuel shorting scheme as effectively as if they had refused to answer the questions at all. These denials of knowledge had the effect of closing off entirely the avenues of inquiry being pursued, namely, what appellants knew about the subject under investigation.
 
 
 38
 To require that the government specifically prove that appellants knew some particular, identifiable fact about the fuel thefts which was not discovered or discoverable by the grand jury from sources other than the appellants themselves is, it seems to us, inconsistent with section 1503 and our interpretation of it in Griffin. It is settled that an un successful "endeavor" to obstruct justice violates section 1503; justice need not actually have been obstructed. United States v. Russell, 255 U.S. 138, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921); Rasheed, 663 F.2d at 853. Section 1503 "makes an offense of any proscribed 'endeavor,' " without regard to the technicalities of the law of attempts or the doctrine of "impossibility." Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 435, 17 L.Ed.2d 394 (1966) (emphasis added). This is equally applicable to endeavors to influence a witness. See, e.g., Falk v. United States, 370 F.2d 472, 475 (9th Cir.1966) (attempt to get two witnesses to give false alibi testimony at trial violates section 1503 although neither witness actually testified); United States v. Davis, 752 F.2d 963, 968, 973 & n. 11 (5th Cir.1985) (urging and advising a witness to testify falsely violates section 1503; when so solicited, the witness had already secretly agreed to cooperate with the government and the conversation was recorded); United States v. Tedesco, 635 F.2d 902, 904, 907 (1st Cir.1980); United States v. Silverman, 745 F.2d 1386, 1394 n. 11, 1395 (11th Cir.1984) ("the success of the attempt to influence a witness is not a necessary element of the offense" and "the prosecution need not prove that the due administration of justice was actually obstructed or impeded"). In Griffin, we rejected what might have been an arguable construction of section 1503, namely, that it applied only to influencing or interfering with other witnesses or nontestimonial evidence. Id., 589 F.2d at 203-04. We refused to recognize for this purpose "a distinction between one who induces a witness to commit perjury ... and one who perjures himself," stating:
 
 
 39
 "[U]sing threats or bribes to prevent a grand jury witness from testifying truthfully has the result of concealing and altering the nature of evidence. If such conduct constitutes an obstruction of the administration of justice, as we held in Partin [United States v. Partin, 552 F.2d 621, 641 (5th Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) ], then so does testifying falsely; the result in either case is the same." Griffin, 589 F.2d at 203 (footnote omitted).
 
 
 40
 To suggest, then, that appellants' false denials of any knowledge of the material matters they were asked about must have actually impeded the grand jury in some way beyond having the same effect as if appellants had wholly refused to testify, thus entirely closing off appellants' observations and knowledge of the fuel thefts as avenues of grand jury inquiry, is to essentially either require more than an "endeavor" or to restrict section 1503 in this respect to actions directed against other witnesses or nontestimonial evidence. Neither course is open to us.
 
 
 41
 There was ample evidence provided by the government that each appellant testified falsely before the grand jury with the specific purpose of impeding the grand jury's investigation. There were numerous former employees of Fredeman's who had worked with or under each of the appellants and who testified to appellants' participation in the fuel thefts. Each of the latter had worked for the Fredemans for several years. Some of them had been hired by a Fredeman. The former employees who admitted that stealing occurred were often unable to give specifics on the Fredemans' personal involvement in the scheme, perhaps because they were for the most part shorter-term employees who would not have been in a position to discuss or observe the Fredemans' illegal activity. All of these appellants had intimate knowledge of all aspects of the fueling operation and were long-time employees who more than likely possessed incriminating knowledge as to the Fredemans themselves. Their persisted in, flat, total denials of any knowledge when questioned before the grand jury were not only false, but also were intended and calculated to impede the grand jury's investigation as effectively as if they had refused to answer the questions at all and had the effect of closing off entirely the avenues of inquiry which appellants represented. There is no evidence to suggest that appellants' united, false "stonewalling" before the grand jury had any other purpose or any lesser effect. We are bound by Griffin, and under any reasonable reading of it, this suffices to make out a section 1503 violation.
 
 Conclusion
 
 42
 Because of Williams' death, his appeal is severed from that of the other appellants, and Williams' case is remanded to the district court with instructions to vacate his conviction and sentence and to dismiss the indictment as to him.
 
 
 43
 As to all the other appellants, their complaints on appeal present no reversible error, and their convictions and sentences are accordingly affirmed.
 
 
 44
 REMANDED with instructions as to Williams; otherwise AFFIRMED.
 
 
 
 [1]
 Williams was assessed a fine of $10,000 and five years' confinement. Tyler and LeDoux were each sentenced to three years and fined $5,000. Phillips was sentenced to three years and fined $4,000; Wiggins was sentenced to two years and fined $3,000, and Salter and May were each sentenced to two years and fined $2,500. Each of the confinement sentences was probated for a five-year period
 
 
 [2]
 Midstream fueling involved fueling vessels away from the docks. It was often more advantageous than dock fueling because the customer's vessel did not have to engage in laborious and time-intensive docking procedures
 
 
 [3]
 Those with primary roles in the Fredeman enterprises were William Fredeman, Sr. and his sons, Henry and William, Jr. (Bill). By the time of the below-mentioned civil lawsuit, which in many respects give rise to the present indictment, William Fredeman, Sr. was no longer active in the operations of the companies due to advanced age. After he underwent several medical examinations, the district court in this proceeding found him mentally incompetent to stand trial and the charges against him were dismissed
 
 
 [4]
 Palmer Midstream was the marine distributorship for the area of Port Arthur, Beaumont, and Orange, Texas, and Lake Charles, Louisiana. Another Fredeman fueling company, Calcasieu Fuelers, was located in Carlyss, Louisiana. Also located in Carlyss was the Fredeman's Calcasieu Locks Shipyard. Cap Fredeman was the head of the entire organization until he became incompetent. Henry and Bill were vice presidents of the organization, with Henry overseeing the fueling companies and Bill directing PATCO
 
 
 [5]
 The Fredeman businesses grew substantially in the 1970s. By the time Cap Fredeman "stepped aside" in 1979, his operations had an estimated worth in the neighborhood of $100 million or more
 
 
 [6]
 John Palmer, who ran Palmer Midstream when it first started, testified as to how inventory was recorded for a "typical day." He stated, "Your beginning inventory [was] 400,000 gallons. Your ending inventory, 300,000 gallons. Gallons consumed from inventory 100,000. Your meter tickets for the day equal 115,000 gallons for your sales. You deduct the amount consumed from the inventory and that gives you the amount of overage for the day."
 
 
 [7]
 LeDoux began working for the Fredemans in 1961, Tyler in 1963, Williams in the mid-60s, Wiggins in 1967, Salter in 1976, and Phillips and May in 1977
 
 
 [8]
 The actual process of refueling was the deckhand's responsibility, but the boat captain would often assist in the process, and would normally observe it
 
 
 [9]
 The Fredemans' primary competitors were Union City Fuel Company, owned and operated by the Lee family; and Marine Fueling, owned and operated by the Bean family. By the early 1980s, Union City was heading for bankruptcy. The Fredemans claimed that Union City's problems were the result of mismanagement. The Beans fared better than the Lees, although they were not as wealthy as the Fredemans
 
 
 [10]
 The Lees filed the initial suit against the Fredemans, but the Beans later joined the Lees' lawsuit
 
 
 [11]
 In January 1986, the civil suit finally settled for an undisclosed sum. All of the claims and counterclaims were dismissed with prejudice upon joint motion of the parties
 
 
 [12]
 Appellants May and Salter appeared before the grand jury on January 23, 1986. LeDoux appeared on February 13, 1986. Tyler, Wiggins, and Phillips appeared on February 27, 1986
 
 
 [13]
 The prosecutor's statements to appellant Phillips are representative of his remarks to the other appellants regarding their target status. The prosecutor explained as follows:
 "Let me explain to you ... you are here as a witness. You were not subpoenaed as a target of the investigation, which means that you are not called here because you are a person being investigated; you were called here to give information about a general investigation that is going on in the grand jury; ....
 "....
 "That does [not] mean, though, if we do get enough information together that we feel that it would merit prosecuting you, that we wouldn't go ahead and prosecute you in the future; ...."
 The prosecutor did not give this assurance to LeDoux inside the grand jury room; however, the government conceded that LeDoux received such an assurance by the prosecutor outside the grand jury room.
 
 
 [14]
 All of the appellants had counsel available at the time of their grand jury testimony. Although their attorney was not allowed inside the grand jury room while the appellants gave their testimony, each appellant was advised by the prosecutor that he could stop the proceedings at any time to consult his attorney
 
 
 [15]
 May and Salter were apparently not advised of their Fifth Amendment rights while in front of the grand jury. Whether or not they were so advised shortly prior to going before the grand jury is not shown by the record. No one raises this as an issue on appeal
 
 
 [16]
 Appellants were found not guilty on two of four counts charging them with mail fraud in violation of 18 U.S.C. Sec. 1341. None of these mail fraud counts was in any way dependent on the section 1503 counts on which appellants were convicted
 
 
 [17]
 Obstruction of justice under 18 U.S.C. Sec. 1503 may constitute a predicate act under the RICO statute, 18 U.S.C. Sec. 1961(1); whereas perjury, 18 U.S.C. Secs. 1621, 1623, cannot constitute a predicate act
 
 
 [18]
 A footnote in appellants' brief states that the record evidence shows as follows:
 "(1) the government summoned Appellants before the grand jury at the very end of its two year investigation believing, and believing it could prove, that they had lied under oath in their civil depositions ...; (2) the government so acted knowing it would ask Appellants questions similar ... to those asked ... in their depositions; (3) rather than advising Appellants that it was believed they had lied and that they had participated in illegal conduct, the government chose affirmatively to advise Appellants that they were not targets of the grand jury investigation, but were called merely as witnesses; (4) the government thereby induced Appellants to waive their Fifth Amendment rights and testify before the grand jury; (5) the government then simply let Appellants repeat their civil deposition testimony, without challenge; (6) the government proceeded to use that testimony to indict Appellants for racketeering, ... and obstruct[ing] ... justice ...; (7) in the short time between Appellants' grand jury appearances and the return of the Indictment, no new evidence was discovered to explain the change in Appellants' status from that of 'nontargets' to defendants ...; (8) without the additional predicate acts of obstruction of justice charged, it is questionable whether the necessary approval to indict Appellants as racketeers could have been obtained at all...." (Emphasis in original.)
 
 
 [19]
 The discussion between the lower court and the prosecutor on the target status issue was as follows:
 "THE COURT: Well, if you knew that [an appellant] had lied in the deposition testimony, how could you with good [conscience] tell him when he came before the Grand Jury that he was not a target defendant?
 "[THE PROSECUTOR]: Because at that time, Your Honor, we had no intentions of indicting that defendant. That was the situation....
 "THE COURT: Even though you knew he had lied ... ?
 "[THE PROSECUTOR]: That's correct....
 "....
 "THE COURT: All right. And when he came before the Grand Jury to testify, you told him he was not a target defendant?
 "[THE PROSECUTOR]: That's correct....
 "THE COURT: And you told him that knowing that he had not been truthful ... about the same matters that you were going to inquire about?
 "[THE PROSECUTOR]: That's correct, Your Honor."
 The prosecutor informed the court in essence that the decision to indict appellants was not made until after they had testified, and that when they were called "the extent of this obstruction of justice conspiracy, that included the Grand Jury testimony" was "not clear to us at that time." A conspiracy to obstruct justice count was included in the indictment, but appellants were not convicted thereof. It was not clearly established that the prosecutor's referenced explanation was false.
 
 
 [20]
 The prosecutor called over forty witnesses to testify before the grand jury, most of these either current or former employees of the Fredemans. Many of the shorter-term employees who admitted to participation in fuel thefts did not have personal knowledge of direct involvement by the Fredemans in any illegal activity
 
 
 [21]
 Hartmut Frank Jahn, a former employee of the Fredemans, testified at trial that he knew that the Fredemans were engaged in illegal activity and that he had lied about his knowledge in his two civil depositions. When being impeached on cross-examination for his previous lies, Jahn stated that "[w]hen the FBI showed up at [his place of employment] and start[ed] questioning me, I figured it was time for me to just straighten things out."
 
 
 [22]
 For example, at the start of Wiggins' grand jury testimony, the prosecutor advised Wiggins that he was subject to the laws of perjury and that Wiggins could receive up to five years in prison for every false statement that he made. After several general information questions, the prosecutor stated, "I want you to listen to this question carefully. It is real important. I will remind you again that you are under oath and you understand that this is subject to the laws of perjury, okay?" Wiggins responded that he understood the perjury implications and then the prosecutor proceeded to ask him about his knowledge of fuel thefts. Wiggins denied any knowledge of such activity
 
 
 [23]
 We recognize that in United States v. Jacobs, 531 F.2d 87 (2d Cir.), vacated and remanded, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277 (1976), aff'd on remand, 547 F.2d 772 (2d Cir.1976), cert. dismissed, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978), the Second Circuit in the exercise of its supervisory powers ordered suppression of allegedly false grand jury testimony where the witness, later charged with perjury, was not informed she was a target or that she had a right to remain silent. It did so, however, not on a finding of prejudice to the defendant--though it intimated that the perjury count would make conviction on the substantive count easier if both were joined in a single trial, id., 547 F.2d at 775--but only "to impose a one-time sanction to encourage uniformity of practice (whatever the practice might be) between the Strike Force and the United States Attorney in the same district." Id at 773 (emphasis in original); see also id. at 775-76 ("[o]ur only purpose was to make the practice of the Task Force conform to that of the United States Attorney in the same district"), and 778 ("it is not intended to mandate any specific procedure, but to serve as an ad hoc sanction ... to enforce 'consistent performance' one way or the other"). And see id., 531 F.2d at 90. We have not had called to our attention any systemic or recurring inconsistency in procedure such as concerned the Second Circuit in Jacobs. Moreover, Jacobs was decided prior to the decisions in United States v. Payner, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), and, United States v. Hastings, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1985), which counsel against use of the supervisory power to control executive conduct rather than to redress cognizable prejudice to a defendant. See also Bank of Nova Scotia v. United States, --- U.S. ----, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). While we cited Jacobs in United States v. Whitaker, 619 F.2d 1142, 1149-50 (5th Cir.1980), we neither approved nor disapproved it, and simply concluded that the case then before us was "not an appropriate case for an exercise of our supervisory jurisdiction." We do not regard either Jacobs or Whitaker as mandating exercise of our supervisory jurisdiction to reverse appellants' section 1503 convictions
 
 
 [24]
 Due administration of justice refers to "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed." United States v. Partin, 552 F.2d 621, 641 (5th Cir.1977), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); United States v. Griffin, 589 F.2d 200, 203 n. 4 (5th Cir.1979)
 
 
 [25]
 In 1982, Congress amended section 1503 (but not its omnibus clause) and removed the express references to witnesses, enacting at the same time 18 U.S.C. Sec. 1512 expressly addressing threats or force against or intimidation of witnesses (and certain others). However, we have held that Congress did not thereby intend that urging or advising a witness to testify falsely be exempt from prosecution under the final or omnibus clause of section 1503. See United States v. Wesley, 748 F.2d 962, 964-65 (5th Cir.1984) (also suggesting that threats against a witness may still be prosecuted under the omnibus clause of section 1503)
 
 
 [26]
 The prosecutor's questioning of appellant Tyler before the grand jury is representative of the questioning of each of these appellants. The following answers are a portion of his grand jury testimony:
 "Q. Now, the entire time you have worked for Channel Fueling Service[ ] and the other names that it went under, were you ever aware of, either from observing it yourself personally or hearing it from other people in the company, that Channel Fueling Service was underdelivering fuel to any of its customers?
 "A. No, sir.
 "Q. You never saw that, never heard that from anybody?
 "A. No, sir.
 "Q. Okay, had you ever seen ... any kind of device that could be used to divert fuel back into the barge after it passed through the fuel meters? Do you understand what I'm asking?
 "A. Yes, sir. No, sir, I have never seen anything like that.
 "Q. When I say underdeliver or steal fuel, do you know what I'm saying? I mean charge fuel on the meters and not deliver the full amount that is billed to the customers?
 "A. Yes, sir.
 "Q. And you have never heard of any of that going on in the company?
 "A. No, sir, not until now.
 "Q. Did you ever hear of fuel being run up on the meters and--before fuel was delivered to the customers, so that they would be billed more than they were actually getting?
 "A. No, sir.
 "....
 "Q. And [Williams] never encouraged you to do that or told you to tell your employees to do that?
 "A. No, sir.
 "Q. And you never did that yourself?
 "A. No, sir.
 "Q. Never talked to the employees about doing it and had no knowledge of that going on?
 "A. No, sir.
 "Q. Do you know anything about any bonuses ever being paid to employees based on shorting customers fuel?
 "A. No, sir.
 "Q. Do you know anything about any bribes, any gifts being given boat captains in order to gain their cooperation in shorting customers fuel?
 "A. No, sir.
 "Q. No bribes or anything like that?
 "A. No, sir."
 Contrary to appellants' contention, the prosecutor's questioning of each appellant was fairly rigorous. The prosecutor repeatedly attempted to solicit any knowledge of illegal activity. There is little more a prosecutor can do, other than what the prosecutor did here, when the witness flatly responds "No" to each of his inquiries.
 
 
 [27]
 This enactment provided:
 "An Act declaratory of the law concerning contempts of court.
 "Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts.
 "Sec. 2. And be it further enacted, That if any person or persons shall, corruptly, or by threats or force, endeavour to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor, by indictment, and shall, on conviction thereof, be punished, by fine not exceeding five hundred dollars, or by imprisonment, not exceeding three months, or both, according to the nature and aggravation of the offence."
 
 
 [28]
 Section 401, 18 U.S.C., provides:
 "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as--
 "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
 "(2) Misbehavior of any of its officers in their official transactions;
 "(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."
 
 
 [29]
 The title of the Act of March 2, 1831--"An Act declaratory of the law concerning contempts of court"--clearly appears to relate only to the first section, which was all the bill consisted of when it passed the House
 
 
 [30]
 "The books propound the question whether perjury is contempt, and answer it with nice distinctions. Perjury by a witness has been thought not enough where the obstruction to judicial power is only that inherent in the wrong of testifying falsely. Ex parte Hudgings, supra. For offenses of that order the remedy by indictment is appropriate and adequate."
 
 
 [31]
 "Originally all false swearing was punishable summarily as criminal contempt in the federal courts" (id. at 205; footnote omitted), and " '[t]he early requirement that perjury must be "apparent on its face" to be punishable as contempt became a rule that "obstruction" ... must be shown in addition to the perjury.' " Id. at 206 (quoting Note, Jury Trial for Criminal Contempts, 65 Yale L.J. 846, 850-51 (1946))
 
 
 [32]
 Hudgings also expressly recognizes that contempt "is not controlled by the limitations of the Constitution as to modes of accusation and methods of trial generally safeguarding the rights of the citizen," id. 39 S.Ct. at 339, and speaks of the "potentiality of oppression and wrong" if a judge could punish summarily a witness testifying before him merely because he believed the testimony willfully false. Id. at 340. Hudgings also expresses concern that the judge could hold the witness incarcerated until he purged himself by giving testimony which the judge credited. Id
 As we observed in Griffin, 589 F.2d at 206 n. 8, it was not until many years after Michael that the Supreme Court developed the right to trial by jury for nonpetty contempt. See, e.g., Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).
 
 
 [33]
 This enactment provided:
 "That if any person shall wilfully and corruptly commit perjury, or shall by any means procure any person to commit corrupt and wilful perjury, on his or her oath or affirmation in any suit, controversy, matter or cause pending in any of the courts of the United States, or in any deposition taken pursuant to the laws of the United States, every person so offending, and being thereof convicted, shall be imprisoned not exceeding three years, and fined not exceeding eight hundred dollars; and shall stand in the pillory for one hour, and be thereafter rendered incapable of giving testimony in any of the courts of the United States, until such time as the judgment so given against the said offender shall be reversed."
 
 
 [34]
 See notes 27 and 33, supra. By 1909, the perjury penalty had been increased to five years' confinement, Act of March 4, 1909, sec. 125, 35 Stat. 1111, while that for endeavoring to obstruct justice (now section 1503) had been increased to one year. Id., sec. 135, 35 Stat. 1113
 
 
 [35]
 See Griffin, 589 F.2d at 206 n. 10; United States v. Ruggiero, 472 F.2d 599, 606 (2d Cir.1973)
 Since then, the confinement penalties have come to be the same and the perjury two witness rule has been abrogated, but these earlier differences remain relevant to the intent of the 1831 enactment.
 
 
 [36]
 See note 26, supra, for a representative sample of appellants' grand jury testimony. Griffin's false grand jury testimony included the following:
 "Q. Do you know anything about a plane crash of a plane going to South America?
 "A. Know anything about? No, sir.
 "....
 "Q. Did Mr. Ebeling ever tell you that if you didn't pay him the money you owed him you'd put him in the middle between him and some other people, put him in a bad spot?
 "A. I would put him in a bad spot?
 "Q. Yes. If you didn't pay him the money you owed him?
 "A. No.
 "Q. Do you know an individual named Dominick?
 "A. No, sir.
 "Q. Do you know anyone named Angelo?
 "A. No, sir.
 "Q. Do you know brothers named Dominick, Angelo?
 "A. No." Id. at 202.
 
 
 [37]
 For example: "Q. Have you ever discussed with Mr. Ebeling, Bob, anything about a plane crash being on its way to South America? A. Not that I can recall, with him." Id. at 202
 
 
 [38]
 That purely false witness testimony, as opposed to that which is evasive or to an outright refusal to answer, can violate section 1503 is likewise reflected in our decision in United States v. Howton, 688 F.2d 272, 277 (5th Cir.1982)